PECK (ARNOLD v.). See Case No. 561a.

## Case No. 10,889.
### PECK et al. v. BURNS et al.
[5 Ben. 537.] [1]

District Court, S. D. New York. Feb., 1872.

COLLISION AT SEA—STEAMER AND BARK — LIGHTS —CHANGE OF COURSE OF BARK.

1. The bark C. was sunk in a collision with the steamer K., at sea, about 240 miles from New York, the collision occurring about 7:30 p. m., on September 1st, 1864. The bark was sailing nearly west. with the wind northeast. at a speed of about seven knots an hour. The steamer's course was nearly east. The bark had no lights set, but she was seen on the port bow of the steamer, whose helm was at once ported. Her helm was then put hard aport, and her engine was stopped and backed, because the officer in charge saw that the bark had starboarded. The bark did starboard after she saw the steamer, and the excuse given for it was, that she saw the steamer's white and green lights about a point on her starboard bow, and did not see the steamer making any change. *Held*, that, as the officer in charge of the steamer saw the bark on his port bow, coming on a parallel course, it was not wrong for him to port.

2. On the evidence, the bark starboarded after the steamer had ported. It was a fault in her to so change her course.

3. Having changed her course, it was not for her to criticise closely the movements of the steamer in extremis, and she must make out satisfactorily that it was wrong for the steamer not to steady or starboard, instead of continuing to port.

4. She had failed to establish this, and must be held in fault for the collision.

[This was a libel by William M. Peck and others against John Burns and others to recover damages for the loss of libellants' vessel, caused by a collision with respondents' steamship.]

W. Tracy, for libellants.
D. D. Lord, for respondents.

BLATCHFORD, District Judge. On the 1st of September, 1864, at about half past 7 o'clock, p. m., the bark Czarina, while on a voyage from Palermo, in Sicily, to New York, and the steamship Kedar, while on a voyage from New York to Liverpool, came into collision with each other, about 240

miles from New York, the steamer, with her stem, striking the starboard side of the bark. The bark soon sank, with her cargo, her crew being saved. The libellants, as owners of the bark, bring this suit to recover for the loss of the vessel and of her charter money for the voyage.

The libel alleges, that the bark was sailing, on a northeasterly wind, on a course nearly due west, and at the rate of about seven knots an hour; that the steamer was on a course nearly east; and that the collision was occasioned by the improper and unskilful and negligent management of those navigating the steamer, in not avoiding the bark.

The defence, on the merits, on the part of the steamer, is, that the bark was discovered a very short distance ahead of the port bow of the steamer; that it was after dark; that the steamer had her usual lights set, namely, a white light at her masthead, a green light on her starboard side, and a red light on her port side, all of which were burning brightly; that the bark took no measures to warn the Kedar of her proximity; that the bark had no lights set, and no lookout; that she was not discovered until she was just ahead of the steamer's port bow; that, as soon as she became visible from the steamer's forecastle, she was reported by one of the lookouts, and the steamer's helm was immediately put hard aport, and her engines were reversed; that the steamer had two men stationed as lookouts on her forecastle, and officers and men stationed on deck and in the engine room, in such manner as to change her course, or stop her almost instantly, on the approach of danger; and that the collision happened through the carelessness and mismanagement of those in charge of the bark, and especially by reason of their omission to set the lights usual in sailing vessels, and of their omission to show a light to warn the steamer of the approach of the bark, after the steamer's lights became visible, and of their omission to set a proper lookout, and of their putting the helm of the bark astarboard shortly before the collision.

It is very much to be regretted that the testimony of the witnesses in this case, on both sides, was not taken at an earlier day after the collision, when their recollections were more to be relied on. The witnesses from both vessels have been examined by depositions in writing. Although the collision happened on the 1st of September, 1864, the libel was not filed until the 7th of February, 1866. The witnesses from the steamer comprise eight persons, all of whom were examined in May, 1868. The witnesses from the bark comprise three persons, one of whom (Morse) was examined in September, 1869, the second (Peavey) in February, 1870, and the third (Cotter) in July, 1870.

Goffin, the chief officer of the steamer, was the officer of the deck, and on the

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

bridge. The other persons on her deck, all of whom have been examined, were two men on the lookout at the bow, two men at the wheel, and the third officer at the con compass. Goffin says, that the first he heard was, one of the men on the lookout reported something white, and then, immediately, a vessel on the port bow, or nearly ahead; that he answered "all right," and then, in the same breath, ordered "port," and immediately afterwards, "hard aport," and then immediately cried out down the engine room, which was near at hand to him on the bridge, "stop her," and "reverse, full speed;" that these orders were immediately attended to; and that, immediately after that, the collision took place. As soon as the bark was reported, Goffin looked at her through his glass, she then being about a point on his port bow. He made her out to be a vessel. He then gave the order to port. He then observed her again, and saw that she was coming with a free wind, with her yards almost square, and in a direction almost parallel to the course of the steamer. He afterwards noticed that the bark had starboarded her helm and changed her direction, and he then, and because of that, gave the order to hard aport. He gives, as his reason for porting, and not starboarding, that the bark was on his port bow and coming in an almost parallel direction. When, after porting, he saw that the bark had starboarded, he says he did not then steady or starboard, because the vessels were too close, and he thought he saw less danger in porting hard aport. He says there would have been no collision if the bark had not starboarded, because the porting of the steamer, the bark keeping her course, would have carried the steamer clear of the bark to the southward. No light from the bark was visible to the steamer. The weather to the eastward, to the view of the steamer, was dark, cloudy and hazy. The steamer had lost a great deal of her speed before she struck the bark. The bark was struck abaft of her fore rigging, the steamer still swinging on her port helm, and the blow angling forward on the bark. The steamer had fallen off five or six points by her porting, and the bark had fallen off several points by her starboarding.

It is not disputed that the bark did starboard after discovering the steamer. On the proofs, the bark exhibited no light before she starboarded. Her excuse for starboarding is, that she saw the steamer's lights about a point on her starboard bow, and saw the white and green lights, and starboarded because she did not see the steamer making any change. Having done this, she charges it as a fault on the steamer, that the steamer did not starboard instead of porting. Undoubtedly, if the steamer had, in the first instance, starboarded instead of porting, and the bark had either kept her course or starboarded, there would have been no collision. But, seeing the bark, as he did, on his port bow, and

coming on a parallel course, which was, in fact, her course before she starboarded, it was not wrong in the officer of the Kedar to port. On the whole evidence, it must be held that the bark starboarded after the steamer had ported. It was wrong in the bark to starboard. It was her duty to keep her course. The only fault which the libel alleges against the steamer is, that she did not avoid the bark. She made the proper manoeuvre seasonably to avoid her. The lookouts on the steamer were proper and vigilant. The effort made to avoid the bark was thwarted directly and palpably by the starboarding of the bark. The bark having so starboarded wrongfully after the steamer had ported, it is not for the bark to criticise closely the movements of the steamer in extremis. The peril was brought, not by the porting of the steamer, but by the starboarding of the bark. Having brought herself into that peril, the bark must make out very satisfactorily that it was wrong in the steamer not to steady or starboard, instead of continuing to port. This the bark has, in my judgment, failed to do. The steamer stopped and reversed as quickly as possible after she discovered that the bark had starboarded, and she discovered that as soon as it took place. When the steamer first ported there was nothing to indicate a necessity for slackening her speed, or for stopping or reversing. The bark was on her port bow, and coming on a parallel course.

I can discover no fault in the steamer, and, therefore, dismiss the libel, with costs.